**GLENS FALLS INSURANCE COMPANY, Plaintiff,**

v.

**DANVILLE MOTORS, INC., Defendant.**
**No. 1414.**

United States District Court
E. D. Kentucky,
at Lexington.
March 27, 1963.

William A. Miller, Louisville, Ky., for plaintiff.

Pierce Lively, James F. Clay, Danville, Ky., for defendant.

HIRAM CHURCH FORD, District Judge.

The Court has jurisdiction of the parties and the subject matter of this action. The case was tried to the Court without the intervention of a jury.

At the time hereinafter referred to, the defendant, Danville Motors, Inc., owned and operated a public garage and service station in a building located on South Fourth Street in Danville, Ky. Adjoining the defendant's building on the south side thereof, there was an apartment building which was higher than the garage. At the front of the garage building facing the sidewalk was an area used for show rooms and offices, at the rear of which was defendant's service department where repairs on motor vehicles were made, to which access was afforded by a passway extending thereto from Fourth Street. At the rear of the building was an open lot or area approximately 90 x 140 feet, with access to it from the service department.

On June 9, 1960, a fire occurred in the service department of the defendant's building which spread to and destroyed the adjacent apartment building upon which the owners maintained insurance against loss or damage by fire with the plaintiff, Glens Falls Insurance Company, in the sum of $57,178.25, which amount was paid by plaintiff to the owners of the apartment building under the terms of the policy. The plaintiff, by subrogation, having acquired the rights of the owners of the apartment, here seeks to recover from the defendant the amount of insurance so paid on the ground that the direct and proximate cause of the fire which resulted in the destruction of the insured's apartment building was negligence on the part of the defendant, its agents, servants and employees.

The fact that the fire which spread to and destroyed the apartment building originated on the defendant's garage property is not disputed, nor is there any issue presented as to the right of the plaintiff to maintain the action. The only question presented is whether negligence on the part of the defendant, its agents, servants and employees engaged in the scope of their employment was the proximate cause of the fire.

On the day of the fire, there was a truck which had been placed in the defendant's service department for repairs, upon which it was discovered there was a leak from its gasoline tank. The defendant's employee George Weldon, who was experienced in making such repairs, was directed by the shop foreman, Basil Cole, to repair the gas tank. Without checking the source or extent of the leak, George Weldon drove the truck from the back end of the garage where it was located and placed it upon a wheel allignment rack located along the North wall fairly close to the front of the service department. According to his testimony, this wheel allignment rack elevated the vehicle about two feet above the level of the floor; and according to the testimony of his brother, Buford Weldon, he measured the distance of the gasoline tank on a Ford truck similar to the truck in question, resting on its wheels, with its tires inflated, and it was 11 inches above the ground, thus making the elevation of the gasoline tank on the truck, when it was on the allignment rack, approximately three feet above the floor. George Weldon then got out of the truck and procured a drain pan which he placed on the floor under the truck to receive the drainage of gasoline leaking from the gas tank of the truck. The drain pan was made from the bottom portion of a 55 gallon drum. It was about 6½ inches deep and 22 inches in diameter. Two-thirds of the top was open, and approx-

imately one-third of the top was covered with a small piece of metal. After placing the drain pan under the leak, by the use of a board on four wheels known as a "creeper", Mr. Weldon, by lying thereon, rolled underneath the vehicle and inspected the gasoline leak and found it dripping. He then went from under the vehicle and obtained a wrench for use on the plug located in the bottom of the gas tank. He then returned on the "creeper" and loosened the plug, thereby increasing the leak, but did not entirely remove it. His manipulation of the plug caused the gasoline to drain more rapidly into the drain pan in an intermittent stream. He again got out from under the truck and procured additional wrenches, returned by means of the "creeper" to the point of the leak and with a wrench reached up to grip the drain plug from which the gasoline was flowing, which to that time had caused two or three inches of gasoline to accumulate in the open pan. *According to the testimony of George Weldon, as he reached for the plug he heard a noise which he described as a "whoomph". He felt heat and saw a flame, in respect to which he testified as follows:*

"Q. 111. What happened then immediately after the flame and the heat and the sound that you have described?

"A. The flame came from the front of the automobile and went over in the pan.

"Q. 112. Did you get out?

"A. Yes, sir.

"Q. 113. You were not burned?

"A. No, sir.

"Q. 114. Did you yell 'fire'?

"A. Yes, sir.

"Q. 115. Was an attempt made to put the fire out?

"A. Yes, sir.

"Q. 116. Did the fire department arrive within a very short time—I believe a few minutes?

"A. Yes, sir.

"Q. 117. And the fire spread very rapidly over the whole of the Danville Motors garage. Is that correct?

"A. Yes, sir.

"Q. 118. At the time you saw this flame will you describe where it was burning?

"A. Under the oil pan.

"Q. 119. With reference to the bottom of the vehicle and the floor where was it burning?

"A. Looked like it was about two or three inches off the floor."

Mr. Weldon further testified as follows:

"Q. 126. Weren't you aware, or not, when you started this operation that draining gasoline into this pan would cause gasoline vapor to accumulate and spread to the surrounding area?

"A. We had done it before.

"Q. 127. That wasn't my question, sir. My question was, when you started this operation and let this gasoline drain down into this pan, weren't you aware at that time that such an operation and the draining of gasoline would permit the gasoline vapors to spread to the surrounding area?

"A. Fumes will come out when you drain it.

"Q. 128. As a matter of fact, can you not see them by their causing a distortion of your vision, a little waviness?

"A. You can see fumes.

\* \* \* \* \* \*

"Q. 133. Were you or were you not aware when you began this operation that gasoline vapors, gasoline fumes, is very easily combustible, very easily ignited? Did you know that?

"A. Yes, sir.

\* \* \* \* \* \*

"Q. 136. Did you do anything to insure that these gasoline vapors, which you knew would be coming from this pan, would not accumulate

in a quantity sufficient to be ignitable or sparked?

"A. No, sir.

"Q. 137. Did you ascertain or make any effort to ascertain whether the ventilating system at Danville Motors, if they had one, was in operation?

"A. No, sir.

"Q. 138. You do not know whether it was in operation at the time, do you?

"A. No, sir.

\* \* \* \* \* \*

"Q. 149. Now Danville Motors has an open lot at the rear of those premises which it uses, does it not?

"A. Yes, sir, we've got new cars out there.

"Q. 150. And there was a passageway from the rear or west door of the Danville Motors across another man's lot to this lot which you have just referred to. Isn't that correct?

"A. Yes, sir.

"Q. 151. And on this lot or in that passageway there was sufficient room, without being in proximity to other vehicles, for you to have conducted this operation, was there not?

"A. There was room out there.

"Q. 152. Why didn't you take this vehicle outside in order to remove and drain the gasoline?

"A. We were told to work inside."

It thus seems clear from the testimony that the gasoline drained by George Weldon from the tank of the automobile passed in an open stream a distance of at least two and one-half feet or more in reaching the pan on the garage floor.

Dr. Myron Howard Chetrick, a qualified expert introduced by plaintiff, testified (p. 150 Tr. Ev.): "But when it flows out in an open stream, if it made contact with the metal opening, this could cause a spark, and on striking the receiving pan it could cause a spark. \* \* \*"

There is evidence that the surrounding vapors may have been ignited in several ways but the fact that it was ignited is undisputed. There is testimony as to other probable causes of the spark which may have caused ignition of the vapors arising from the flowing gasoline.

In Watson v. Ky. & Ind. Bridge & Ry. Co., 137 Ky. 619, 632, 126 S.W. 146, 150, 129 S.W. 341, it is clearly pointed out that where a great volume of gasoline vapor arising from escaping gasoline was caused by negligence, "the probable consequences of its coming in contact with fire and causing an explosion was too plain a proposition to admit of doubt."

With the exception of the President of the defendant corporation, the only testimony introduced on behalf of the defendant was that of automobile dealers who were experienced in draining gasoline from automobile tanks, in an effort to show that the drainage method used in this case was in accordance with the prevailing general custom in such matters. However, it is not shown in the testimony of any of these dealers that the open flow or stream of leaking gasoline was for such a distance as is shown in this case. The only ones who testified as to the elevation of the flow in their experiences were Charles Ellis, who testified "Well, the car generally speaking would have to be jacked up *some several inches*" (emphasis added), and Bailey Wilder, who said: "What we did, we had a twin post lift. We put the car on this lift and then I bought just a big washing tub. I guess the tub would hold between twenty and twenty-five gallons. We would raise the car up on the lift, remove the plug and *let the car down to the tub* and let it run until the tank was empty." (Emphasis added.)

The testimony seems convincing that the method used by the defendant's employee in draining the gasoline from the gasoline tank of the automobile involved in this case by open flow of the stream from an elevation of two feet or more constituted negligence, and that such negligence was the proximate cause of the conflagration in defendant's garage which resulted in the destruction of the adjoining apartment building.

The negligence above mentioned was that of George Weldon, an employee of the defendant Danville Motors, Inc., who was then engaged in the performance of his duties.

For the reasons indicated, the plaintiff is entitled to judgment in the sum of $57,178.25 and costs.